IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. SAG-20-0052 |
| | * | |
| LUKMAN SALAM | * | ***UNDER SEAL*** |

*******

## MEMORANDUM OPINION

On February 11, 2020, a grand jury returned an indictment against Lukman Salam and two co-defendants, alleging conspiracy to commit wire fraud in violations of 18 U.S.C. § 1349. ECF 14.  Currently pending is Salam's "Motion for Review of Detention Order" ("the Motion"), ECF 35, which appeals the detention order issued by United States Magistrate Judge Thomas M. DiGirolamo on April 10, 2020, ECF 32.  Because Salam's Motion provided adequate supporting information and records, this Court did not need to seek supplemental information from the parties.  No hearing is necessary to resolve this Motion.  *See* Loc. R. 105.6 (D. Md. 2018); *see also United States v. Martin,* Crim. No. PWG-19-140, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (finding "ample authority for the conclusion that the Court may decide the [appeal of detention] on the filings . . . as opposed to a hearing.").  For the reasons that follow, Salam's Motion will be denied.

I.   FACTUAL BACKGROUND

At Salam's initial appearance in court on February 13, 2020, the government sought his pretrial detention. Salam consented to detention, with the understanding that he could seek a detention hearing at a later date.  ECF 20.  On March 30, 2020, Salam filed a motion requesting that his detention hearing be scheduled.  ECF 28.  Judge DiGirolamo held a detention hearing on April 10, 2020.  ECF 31.  After the hearing, Judge DiGirolamo found by clear and convincing

1

evidence that no condition or combination of release conditions could reasonably assure Salam's appearance in court, and therefore ordered Salam's pretrial detention. ECF 32.  Just over one month later, on May 14, 2020, Salam filed the instant Motion for Review of Detention.  ECF 35.  He is currently being detained at the Central Detention Facility ("D.C. Jail") in Washington, D.C.  ECF 37 at 1.

## II. STANDARD OF REVIEW

Pretrial detention and release are governed by the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141, *et seq.*  The government is permitted to seek pretrial detention of a defendant who poses a serious risk of flight.  *Id.* § 3142(f)(2).  The BRA instructs the Court to seek "the least restrictive further condition or conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(c)(1)(B).  However, if the Court finds after the hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court "shall order the detention of the person before trial." *Id.* § 3142(e)(1).

The Court's determination is governed by four factors:

(1)  The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

(2)  The weight of the evidence against the person;

(3)  The history and characteristics of the person, including –

(A)  The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)  Whether, at the time of the current offense or arrest, the person was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

 (4)  The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* § 3142(g).

  The BRA permits a defendant who is ordered detained by a United States Magistrate Judge to "file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order," which "shall be determined promptly." *Id.* § 3145(b). The district judge must review the detention issue *de novo* "and must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam); *see also United States v. Clark,* 865 F.2d 1433, 1436 (4th Cir. 1989).

## III. ANALYSIS

  Salam asks this Court to review Judge DiGirolamo's order of detention, which considered his case under the pretrial detention framework in 18 U.S.C. § 3142(f), including application of the four factors set forth in 18 U.S.C. § 3142(g). Salam has not expressly requested temporary release under 18 U.S.C. § 3142(i). However, for the reasons addressed below, this Court will consider the appropriateness of Salam's detention or release under either § 3142(f) or (i).

  At the outset, it is important to review the overall framework of the detention issues presented to the Court, and the impact of COVID-19 and the conditions within the D.C. Jail, on each issue. As described above, when considering whether there are any conditions of pretrial release "that will reasonably assure" a particular defendant's appearance in court, and the safety

3

of the community, 18 U.S.C. § 3142(f), Congress carefully prescribed four factors that a court must consider, *id.* § 3142(g).  None of those factors refers specifically to the health of the defendant, or to whether the conditions of incarceration threaten the defendant's well-being. Instead, Congress focused the required inquiry on the defendant's risk of nonappearance, and the danger that the defendant's release would pose to other individuals.  In some circumstances, clearly, a particular defendant's medical condition could reduce that defendant's risk of flight or danger to the community, and the health condition would therefore fall within the factors appropriately considered in the context of § 3142(g).  Absent those circumstances, however, a particular defendant's health conditions, and the possible risks posed to the defendant by incarceration, do not affect the § 3142(f) and (g) analysis.  *See, e.g.*, *United States v. Clark,* 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) ("A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm *to the defendant* does not usually bear on this analysis."); *United States v. Lawton,* Crim. No. CR419-102, 2020 WL 1984897, at *1 (S.D. Ga. Apr. 27, 2020) (same); *United States v. Whyte,* Crim. No. 3:19-cr-64-1 (VLB), 2020 WL 1911187, at *4 (D. Conn. Apr. 8, 2020) (analyzing medical conditions under § 3142(i));  *United States v. Aguirre-Maldonado,* Crim. No. 20-cr-53 (NEB/TNL), 2020 WL 1809180, at *1 (D. Minn. Apr. 9, 2020) ("While the Court appreciates the unprecedented nature of the COVID-19 pandemic, Defendant has offered no reason why the pandemic would reduce his risk of nonappearance or the risk that he poses to the community.").

However, as will be discussed below, the COVID-19 pandemic is relevant in the assessment of whether a defendant's temporary release might be appropriate under § 3142(i), and will be considered fully in that context, in accordance with the Fourth Circuit's order in *United States v. Creek,* Criminal No. CCB-19-036, ECF 402 (Apr, 15, 2020) (directing the District Court to consider "in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i)").

### A. Detention or Release Pursuant to § 3142(f) and (g)

First, this Court turns to a *de novo* review of the determinations made by Judge DiGirolamo, using the factors set forth in § 3142(g). Taking into account the nature of the charges against Salam, the weight of the evidence, and Salam's history and characteristics, this Court is persuaded that Salam's pretrial detention is appropriate. Specifically, this Court finds by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure Salam's appearance in court if he were released pending trial. Like Judge DiGirolamo, this Court does not find that Salam poses any significant danger to the community, although it is worth mentioning that the internet and email-based fraud engaged in by this conspiracy is capable of being perpetuated without departing one's residence.

As to Salam's risk of nonappearance, the required analysis begins with the nature and circumstances of the charged offenses. According to the Government's factual proffer, Salam participated in a wire fraud conspiracy involving more than $3 million in actual losses. ECF 40 at 3. The scheme involved the use of fraudulent identification documents, including passports

5

and driver's licenses, to open various bank accounts, often in the name of limited liability companies (LLCs). *Id.* at 4. The conspirators then defrauded certain individuals or businesses, using a variety of schemes, to cause them to transfer money into the fraudulently opened accounts. *Id.* at 6. The conspirators quickly withdrew or transferred the fraudulently obtained funds from the fraudulent accounts, and used the proceeds for their own benefit. *Id.* The evidence of Salam's participation in the conspiracy is extremely strong, and includes bank surveillance photos of Salam conducting transactions for the conspiracy. *Id.* at 3, 7. In addition, Salam has admitted to obtaining fake passports and driver's licenses, to using one of the fake passports to open four different bank accounts, to going to banks to withdraw or transfer the funds, and to using a portion of the funds for his own purposes. *Id.* at 5. The bank accounts controlled exclusively by Salam received more than one million dollars of the fraudulently obtained funds. *Id.* at 6.

Upon searching Salam's residence at the time of his arrest, the Government recovered twenty (20) false identification documents: ten matched sets of passports and driver's licenses in ten different false names, bearing Salam's photos. *Id.* at 4-5. Significantly, the Government did not recover any cash, and it has not recovered significant fraud proceeds despite the massive loss figures attributable to the conspiracy. *Id.* at 5. Thus, Salam's presumably extensive proceeds cannot be accounted for and may be available to him from an unknown location. Pursuant to the advisory guidelines, Salam faces a sentence of between five and seven years in prison, even if he pleads guilty to this offense and is found to be in Criminal History Category I. *Id.* at 7. The length of the anticipated sentence provides an added incentive to flee.

Turning to Salam's history and characteristics, even his limited criminal history further illustrates his ability to obtain and use false identification documents. Salam was convicted in

2017 for presenting false identification to law enforcement officers, arising out of an incident in which he presented a false passport and identification card, bearing the name "Peter Babayemi" to a bank teller in an attempt to withdraw funds. *Id.* at 11. He then presented the same false documentation to the law enforcement officers who responded to the scene. *Id.*

Salam is a Nigerian citizen, and has close family ties to Nigeria. *Id.* at 8. He does not own a residence in the United States, and has no spouse or children in this country. *Id.*; ECF 37 at 5 (noting that Salam only rents a townhome in Delaware). While Salam claims to be employed full time as a home healthcare aid, ECF 37 at 5, there is no corroborating evidence of this. According to the Government's proffer, in January, 2020, Salam told investigating agents that he "was involved in buying and selling cars," and Salam's 2019 bank records lack any evidence of regular payment from an employer. *Id.* at 9. Nor could Salam's proposed third-party custodian provide Pretrial Services any details about Salam's employment history. *Id.* Finally, the Government has proffered evidence that, on two occasions, Salam engaged in marriage fraud in attempts to gain legal immigration status in the United States. ECF 40 at 8. On one such occasion, Salam's spouse told immigration officials that he had paid her to marry him and to facilitate his application for immigration status. *Id.*[1]

Also relevant to Salam's history and characteristics, he has presented medical records from the detention facility indicating that, ██████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

---

[1] This Court is not relying on, or considering, the existence of an immigration detainer in assessing Salam's risk of nonappearance.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ██ ████████████████████████████████

████████████████████████████████

In sum, the nature of the charges against Salam, the weight of the evidence, and his history and characteristics all weigh in favor of his pretrial detention. His repeated use of, and access to, false identification documentation and fake identities, the missing proceeds from the alleged criminal enterprise, his close connections to Nigeria, and lack of meaningful connections to the United States all indicate a very significant risk of nonappearance that cannot be mitigated by existing release conditions. Therefore, the Government has proven by a preponderance of evidence that no condition or combinations of conditions of release will reasonably assure the defendant's appearance as required.

### B. Temporary Release Pursuant to Section 3142(i)

Section 3142(i) permits "the temporary release of the person, in the custody of a United States marshal or other appropriate person, to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." Salam's case, like all criminal cases, has been postponed by this Court's most recent Standing Order canceling all non-emergency court proceedings through June 5, 2020, and the delay occasioned by the pandemic has been excluded under the Speedy Trial Act. *See* Standing Order 2020-07, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19,* Case No. 1:00-mc-00308 (D. Md. April 10, 2020). Moreover, on April 23, 2020, Chief Judge James K. Bredar of this Court issued a COVID-19 related order, 20-mc-146, ECF 14, requiring that the D.C. Department of Corrections forthwith "ensure that Maryland detainees have

8

reasonable access to their counsel and that counsel have reasonable access to their detainee clients, via telephone at least." Moreover, while Salam might like to have an in-person visit with his counsel in the near future, in-person interaction for such purposes remains prohibited in some jurisdictions and is otherwise significantly curtailed by public health guidance, even for persons who are not incarcerated. Thus, the Sixth Amendment rights of Maryland detainees at the D.C. Jail will be protected, and there is no need for temporary release to allow for preparation of a defense. When the Court is able to return to standard operations, Salam and his attorney will be afforded whatever time is necessary to confer and to prepare an adequate defense to the pending charges.

This Court must also assess whether there is "another compelling reason" justifying Salam's temporary release under § 3142(i). Prior to the instant pandemic, this provision was "sparingly" used to justify temporary release for specific medical treatments, such as cancer surgery or chemotherapy. *See, e.g.*, *United States v. Hamilton*, Crim. No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *3 (E.D.N.Y. Mar. 23, 2020). Courts' use of section 3142(i) has been far more widespread in the context of COVID-19. The well-reasoned opinion in *Clark*, 2020 WL 1446895, at *3, sets forth four factors to be considered: (1) the original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent to which the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that a defendant's release would increase the COVID-19 risks to others. *Id.*[2] The Defendant bears the burden of establishing those factors. *See United States v. Sanders*, Crim. No. 19-20037-01-DDC, 2020 WL 1528621, at *3 (D. Kan. Mar. 31, 2020). "The question for

---

[2] While *Clark* is not binding, this Court finds its rationale both persuasive and instructive, as have numerous courts around the country, including in this District. *See, e.g.*, *United States v. Green*, No. 19-cr-00539-CCB, 2020 WL 1873967, at *3 (D. Md. Apr. 15, 2020).

the Court is whether the COVID-19 health risks to the Defendant, should he remain detained, outweigh those traditional Section 3142(g) factors *and* the COVID-19 health risk to the community that Defendant's release could occasion." *United States v. Hernandez,* Crim. No. PX-19-158-9, slip op. at 5-6 (D. Md. Apr. 29, 2020), ECF 385.

As described above, the original grounds for detention weigh strongly in the Government's favor, due to the significant risk of nonappearance Salam poses. Turning to the second factor, Salam does have some specific COVID-19 concerns, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, ECF 37-3 at 6, 10, 14, 16, 17. Some medical literature has associated hypertension with an increased risk of severe complications from the COVID-19 virus, but "[t]he extent to which this association between hypertension and complications is ultimately refined to demonstrate that hypertension (and/or the medications used to treat it) as independently causative of complications awaits further study." Order, *United States v. Gibson-Bey,* Crim. No. 19-0563-RDB (D. Md. May 6, 2020), ECF 37 at 4 & n.3 (citation omitted). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Nonetheless, for the purposes of evaluating this motion, the Court will assume that Salam may face some increased risk of severe complications, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In addition to the inherent difficulty with maintaining social distancing in an incarcerative setting, Salam cites extensive information about the general conditions he faces at his particular detention facility. Public reporting reflects that, at CTF and the connected D.C. Jail (collectively herein, "the D.C. Jail"), a large number of detainees have tested positive for COVID-19. While the overwhelming majority have recovered, one detainee has died. *Public Safety Agency COVID-19 Case Data,* Gov't of D.C. (last accessed May 20, 2020),

https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data. A class action lawsuit on behalf of persons incarcerated at the D.C. Jail was filed in the United States District Court for the District of Columbia. *See Banks v. Booth,* No. 20-849-CKK (D.D.C. Apr. 19, 2020). The lawsuit sought immediate release or transfer of those detained, contending that the D.C. Jail's inadequate response to the COVID-19 pandemic violates the detainees' constitutional rights. The presiding United States District Judge, Colleen Kollar-Kotelly, appointed independent inspectors to provide a comprehensive report and recommendations describing the conditions inside the D.C. Jail, with respect to the safety of those incarcerated. *Id.*, ECF 47. Upon review of the inspectors' report, Judge Kollar-Kotelly issued a Temporary Restraining Order, requiring certain specific corrective action aimed at immediately improving the conditions of confinement at the D.C. Jail. *Id.*, ECF 48. Even as of the date of the inspectors' report and recommendations, D.C.'s Department of Corrections ("DOC") had already taken steps towards implementing some of the reforms, as expressed in a memorandum attached to the inspectors' report.

Significantly, despite the findings in the inspectors' report, Judge Kollar-Kotelly did not order the release or transfer of any detainees or inmates, or any reduction in the overall population at the D.C. Jail. *Id.*, ECF 49 at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities."). Judge Kollar-Kotelly's continued monitoring of the litigation, as it moves from the posture of a temporary restraining order to one considering the propriety of any further injunctive or other relief, might result in the imposition of further corrective measures. Additional steps she takes will likely depend on the DOC's compliance with the improvements she has ordered to date. The recent oral report from the monitors, presented to Judge Kollar-Kotelly on May 11, 2020, indicates that conditions at the D.C. Jail are, in fact, improving in many areas. *See, e.g.*, ECF 40-1 at 13:1-14:5 (Copy of Telephone Conf.

Tr., *Banks*, No. 20-cv-00849 (D.D.C. May 11, 2020) (noting that at both facilities, the number of diagnosed cases has continued to decrease since mid-April, and that the number of tests occurring at the D.C. Jail continues to decrease). Ultimately, Judge Kollar-Kotelly and her team of experts and inspectors are in the best position to evaluate the overall conditions at the facility, and to monitor the protection of the constitutional rights of its detainees, including putative class members such as Salam. "Although the pendency of that action does not impede this Court from assessing Defendant's motion under the Bail Reform Act (which, necessarily, requires an *individual* assessment of Defendant's detention situation), some recognition of principles of comity is appropriate to promote the twin goals of avoiding "an unnecessary burden on the federal judiciary" and preventing 'the embarrassment of conflicting judgment.'" *United States v. Hernandez,* Crim. No. 19-00158-PX, ECF 385 at 5 (Coulson, J.) (quoting *In re Naranjo*, 768 F.3d 332, 348 (4th Cir. 2014) and *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979)). Thus, it would be inappropriate for this Court to consider the situation at the D.C. Jail more broadly, other than in the context of the application of the Bail Reform Act to Salam.

In the end, however, as to the second *Clark* factor, the Court finds that Salam's medical conditions and the conditions of his detention at the D.C. Jail may put him at some increased risk of serious complications from the COVID-19 virus.

The final two *Clark* factors involve the nature of the proposed release plan, including the extent to which it is designed to mitigate Salam's exposure to the COVID-19 virus, and the risk that Salam's release would pose to the community. Salam advocates his release to electronic home monitoring. ECF 37 at 16. Unfortunately, as Salam acknowledges, that mechanism of monitoring, which is widely recognized to be the Court's best alternative to incarceration when

close supervision of a defendant is warranted, is currently unavailable. *Id.* at 16-17. Installation of an ankle bracelet cannot be accomplished without a significant risk to the health and safety of the location monitoring specialist, Salam, and the proposed third-party custodian. The currently available monitoring alternatives, such as SmartLink, VoiceID, and Home Incarceration by Phone, only offer periodic "spot-checks" as to the defendant's location, and cannot provide immediate notification to pre-trial services if a defendant absconds without authorization. Immediate notification is particularly important where, as here, the Court's primary concern is risk of flight, and a defendant has significant international ties.

In addition, given the Court's inability to effectively monitor Salam's whereabouts, the degree to which release would protect him from virus exposure "depend[s] in large part on how compliant Defendant would be with the directives of public officials and health experts should he be released." *Green,* 2020 WL 1873967, at *3. Salam's history of fraudulent representations to government officials does not inspire confidence in his ability to be compliant with those directives, or his propensity to be honest with his supervising pretrial officer about his activities.

In terms of the other COVID-related aspects of his temporary release plan, Salam suggests that he be released to the third party custody of a long-time friend, Larry Adeniran. ECF 37 at 17. Adeniran works full time, on a night shift, from 11:00 p.m. to 7:00 a.m., Monday through Friday, which would leave Salam unsupervised during those time windows. The Government has also proffered information that a person using the name Olan Rewaju Adeniran, who is associated with Larry Adeniran's address in public records (and may or may not be Larry Adeniran), appears to travel to Nigeria frequently using his Nigerian passport. Additionally, the information provided by Salam about the residence does not specify the number of residents in the home, the ages of those residents, or any health concerns the residents might have. ECF 40

at 20-21. Whether or not the proposed residence might be suitable in other circumstances, releasing a detainee who has been residing in an institution with known COVID-19 infections into homes with other individuals presents a measurable degree of danger to the community. Further, it is unclear that the medical care Salam might receive in Adeniran's residence, if he were to become COVID-positive, would be superior to that he would receive at the D.C. Jail, where records reflect that he is receiving regular medical checks, and where the vast majority of individuals who have tested positive for COVID-19 have successfully recovered after treatment.

Thus, weighing the four factors enumerated in *Clark,* this Court concludes that three of the four factors weigh in favor of Salam's continued detention. The possibility that he is at increased risk of infection while incarcerated, and might be at somewhat enhanced risk of COVID-19 complications if he contracts the virus, does not, alone, create a "compelling reason" for his temporary release, in light of all of the competing considerations relating to his substantial risk of nonappearance. As Judge Xinis recently stated:

> Finally, this decision in no way minimizes the unprecedented threat that COVID-19 has befallen on our community, country, and world, including places of confinement. For some individuals, the virus visits profound suffering, illness, and even death. This cold reality, however, does not permit the Court to cast the Bail Reform Act aside, but rather to follow it with special care to the individualized circumstances presented. When doing so here, the balance simply does not tilt in favor of [the defendant's] release.

*United States v. Remarque*, No. PX-19-039, 2020 WL 1983927, at *4 (D. Md. Apr. 27, 2020).

## IV.   CONCLUSION

For the reasons stated herein, Salam's Motion for Review of Detention Order, ECF 35, is DENIED.

Dated: May 20, 2020                                                      /s/
                                                                                    Stephanie A. Gallagher
                                                                                    United States District Judge